IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUARANTEED AUTO SALES, KELLY ANN | ) | COMPLAINT |
| WEST D/B/A GUARANTEED AUTO SALES, | ) | AND JURY DEMAND |
| KELLY ANN WEST, and ROBERT CHESGREEN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The United States of America alleges as follows:

1. This action is brought by the United States to enforce the Equal Credit Opportunity Act, 15 U.S.C. § 1691–1691f ("ECOA"), and its implementing regulations located at 12 C.F.R. Part 1002 ("Regulation B").[1]

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the United States' claims under 28 U.S.C. §§ 1331 and 1345 and 15 U.S.C. § 1691e.

3. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the city of Glen Burnie in the District of Maryland, and all defendants reside and/or do business in the District of Maryland.

## DEFENDANTS

4. Defendant Guaranteed Auto Sales ("Dealership") is a used car dealership located at 7214 Ritchie Highway in Glen Burnie, Maryland, and was registered as a "trade

---

[1] Regulation B was originally promulgated by the Federal Reserve and codified at 12 C.F.R. Part 202. The Consumer Financial Protection Bureau recodified Regulation B at 12 C.F.R. Part 1002 in 2011.

name" with the Maryland Department of Assessments and Taxation on January 22, 2013. According to Maryland records, the trade name was not renewed before its expiration on January 22, 2018, and is now considered to be in a forfeited status.

5. After the trade name expired, and continuing to the present, Defendant Kelly Ann West d/b/a Guaranteed Auto Sales has continued to operate the Dealership under the name Guaranteed Auto Sales.

6. Defendant Kelly Ann West is a Maryland resident and has owned the Dealership from at least January 22, 2013, to the present.

7. Defendant Guaranteed Auto Sales and Defendant Kelly Ann West d/b/a Guaranteed Auto Sales offer credit to prospective borrowers in the form of in-house "buy here, pay here" auto financing as well as third-party financing through Credit Acceptance Corporation.

8. Defendant Robert Chesgreen is married to Kelly Ann West, and was at all times relevant to this lawsuit, the General Manager of the Dealership. As General Manager, Defendant Chesgreen was an employee of the Dealership and acted within the scope of his employment while engaging in the conduct described herein.

9. As General Manager, Mr. Chesgreen determines the pertinent terms of sales and financing deals at the Dealership for "buy here, pay here" financing, including the down payments required for financing, whether the down payment may be paid in one or more installments, and what the biweekly re-payment amount will be. Mr. Chesgreen approves credit offered to prospective buyers through the Dealership's "buy here, pay here" financing program.

10. Mr. Chesgreen also determines the threshold criteria prospective borrowers must meet before he initiates an application to Credit Acceptance Corporation ("CAC") to

secure third-party financing, including the down payment amount prospective borrowers must have and whether the down payment may be paid in one or more installments.

11. Defendants are creditors within the meaning of 15 U.S.C. § 1691a(e) and 12 C.F.R. § 1002.2(l).

12. Defendant Kelly Ann West, as owner of the Dealership, is liable for the conduct of her agents and employees.

## FACTUAL ALLEGATIONS

13. The "buy here, pay here" model allows the Dealership itself to provide financing for used car purchases. The Dealership enters into installment sale contracts that allow customers to defer payment on their auto purchases over a period of time at set terms, rather than connecting customers with a bank or other institutional lender for a traditional auto purchase loan.

14. Credit Acceptance Corporation ("CAC") is an indirect auto finance company. The Dealership uses CAC's online Credit Approval Processing System to arrange installment sale contracts for buyers that are immediately assigned to CAC after origination. The Dealership retains a portion or all of the down payment amount and may also receive a percentage of monthly payments to CAC.

15. The United States Department of Justice conducted testing to evaluate Defendants' compliance with the Equal Credit Opportunity Act between September 2017 and April 2018. Testing is a simulation of a credit transaction that compares responses given by creditors to different types of prospective borrowers to determine whether illegal discrimination is occurring.

16. The testers who participated in the United States' tests involving Defendants are "applicants" within the meaning of 15 U.S.C. §§ 1691(a), 1691a(b) and 12 C.F.R.

§§ 1002.2(e)-(f), 1002.4(a) & (b), or "prospective applicants" within the meaning of 12 C.F.R. § 1002.4(b).

17. The testing undertaken by the United States revealed that Defendants' actions, policies, and practices discriminate against applicants on the basis of race with respect to credit transactions in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1), by offering more favorable terms to white testers than to African American testers with similar credit characteristics, including, but not limited to:

   a. *Down payment installments*: White testers were offered the option to fund their down payments in two installments by paying what they had available that day and paying the remaining balance due within 14 or 30 days. In contrast, none of the African American testers were offered the option to pay the money they had available for a down payment that day and then to pay the remaining balance of their down payment at a future date, even though the African American testers had more money available to put down than the white testers ($1,200 instead of $1,100).

   b. *Lower down payment amounts*: In the tests involving CAC financing, all of the African American testers were told that they needed a higher down payment than the white testers were told for the same car (usually $2,000 instead of $1,500).

   c. *Lower bi-weekly payments*: In the test involving "buy here, pay here" financing, the African American tester was quoted bi-weekly payments that were higher than the white tester was quoted for the same car ($150 instead of $125).

   d. *Other acts that discourage African American testers*: Defendants told one

        African American tester that he had to purchase a $1,700 warranty to obtain CAC financing, when no white tester was given this information; and Defendants told another African American tester that it would not be worth a credit inquiry to see if CAC would accept a $1,200 down payment since Mr. Chesgreen was 90% certain it would not be approved with a down payment under $2,000, but a white tester was told that Defendants could try a down payment of $1,100 on the same car and increase it to $1,500 only if necessary to secure CAC financing. *See* 15 U.S.C. § 1691e(g); 12 C.F.R. § 1002.4(b).

18.     Defendants' actions, policies, and practices as described above constitute a pattern or practice of violations of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f.

19.     Persons who have been victims of Defendants' discriminatory actions, policies, and practices are aggrieved applicants as defined in the Equal Credit Opportunity Act, 15 U.S.C. § 1691e. As a consequence of Defendants' policies and practices described herein, these applicants have been denied their rights under ECOA and have suffered injury and damages.

20.     Defendants' conduct was intentional, willful, and taken in disregard of the rights of others.

## PRAYER FOR RELIEF

WHEREFORE, United States prays that the court enter an order that:

1.     Declares that Defendants' discriminatory conduct violates the Equal Credit Opportunity Act, 15 U.S.C. § 1691–1691f;

2.     Enjoins Defendants, their agents, employees, and successors, and all other persons in active concert or participation with Defendants, from:

   a. Discriminating against any person on the basis of race with respect to any aspect of a credit transaction;

   b. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, any aggrieved applicants to the position they would have been in but for Defendants' discriminatory conduct; and

   c. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices; and

3. Awards such monetary damages as would fully compensate the victims of Defendants' discriminatory policies and practices for the injuries caused by Defendants.

The United States further prays for such additional relief as the interests of justice may require.

FOR THE UNITED STATES OF AMERICA:

Dated: September 30, 2019

Respectfully submitted,

WILLIAM P. BARR
Attorney General


ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division


SAMEENA SHINA MAJEED
Chief


/s/ Carrie Pagnucco
LUCY G. CARLSON
Deputy Chief
CARRIE PAGNUCCO
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M St. NE / Room 6.1618
Washington, DC 20530
Phone: (202) 353-9491
Fax: (202) 514-1116
E-mail: carrie.pagnucco@usdoj.gov

Attorneys for Plaintiff
United States of America